# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of:<br><br>KEVIN WAYNE HOUSER,<br><br>         Petitioner. | No. 60768-9-II<br><br>UNPUBLISHED OPINION |

CRUSER, J.—In this personal restraint petition,[1] Kevin Houser challenges his convictions of two counts of first degree child molestation and one count of second degree incest. He argues that (1) the trial court's child competency determination was improper on several grounds, (2) the trial court's child hearsay determination was improper on several grounds, (3) the State failed to present sufficient evidence to support more than one count of first degree child molestation because it presented only generic testimony that did not establish separate acts, (4) the trial court improperly considered false statements in a defense declaration, (5) the trial court violated his constitutional right to confront witnesses when it permitted two witnesses to appear remotely without first conducting a *Craig*[2] hearing, (6) the trial court failed to investigate a witness' competency after she revealed potential memory loss, (7) the trial court erred when it admitted child hearsay evidence of alleged sexual misconduct that was disclosed just two weeks before trial

---

[1] This is Houser's first personal restraint petition challenging his conviction. Houser filed his timely original personal restraint petition in August 2024, almost a month before his direct appeal mandated in September 2024. His appointed counsel filed a timely supplemental brief in February 2025, less than a year after Houser's direct appeal mandated. RCW 10.73.090(1), (3)(b).

[2] *Maryland v. Craig*, 497 U.S. 836, 845-46, 100 S. Ct. 3157, 111 L. Ed. 2d 666 (1990).

and was not described in the probable cause statement, (8) the trial court erred when it admitted DNA and semen stain evidence, (9) the trial court erred when it denied Houser's half-time motion to dismiss and did not require the State to provide a more definite statement of the acts supporting each of the first degree child molestation charges, and (10) the trial court erred when it permitted the substitution of a deliberating juror with an alternate juror that knew one of the witnesses. Houser also raises numerous ineffective assistance of counsel claims and prosecutorial misconduct claims, several of which relate to the issues described above, and he argues that cumulative error deprived him of a fair trial.

This personal restraint petition is denied.

FACTS

I. BACKGROUND

The following summary of the background facts was set out in Houser's direct appeal:

In February 2020, A.H. displayed sexual behavior with her brother that caught the attention of Brian Cooley, her mother's boyfriend. When Cooley asked where A.H. learned about the behavior, she implicated her father and made comments that suggested that he molested her when she visited him. At some point during that same day, Cooley shared the disclosure with A.H.'s mother, Apollonia Boyd. A.H. was taken to the hospital after the disclosure. During the visit to the hospital, a social worker became involved and Child Protective Services [ ] and law enforcement were alerted.

*State v. Houser*, 30 Wn. App. 2d 235, 240, 544 P.3d 564, *review denied*, 3 Wn.3d 1015, 554 P.3d 1223 (2024).

II. INVESTIGATION

The direct appeal opinion also summarized AH's forensic interview, AH's statements made during a medical exam, and interviews with Boyd and Cooley as follows:

A few days later, Keri Arnold, a forensic interviewer with the county prosecutor's office, conducted a videotaped interview with A.H. about the abuse. A child-interview facility dog was sitting next to A.H.

Like her earlier disclosures to Cooley, A.H. made several statements to Arnold during the interview that suggested her father had molested her. A.H. said that when she was visiting with her dad, she slept in the garage with him. She said she slept on her own bed. A.H. said that during the visits, her father had been touching her "where he's not supposed to" and then indicated where that was by pointing to her genital area. [Quoting No. 57808-5-II 5 Verbatim Rep. of Proc. ] at 155; [No. 57808-5-II] Ex. 51B. But A.H. appeared reluctant to give details of the alleged abuse and said talking about it felt "not good." [Quoting No. 57808-5-II 5 Verbatim Rep. of Proc.] at 121; [No. 57808-5-II] Ex. 51B.

Immediately after the forensic interview with Arnold, A.H. was medically examined by Michelle Breland, a pediatric nurse practitioner. During the examination with the nurse, A.H. made similar disclosures, specifically that her father was, "touching her where he was not supposed to," and pointed to her genital area. [Quoting No. 57808-5-II 5 Verbatim Rep. of Proc.] at 95.

Meanwhile, Detective Shelby Wilcox interviewed Boyd, . . . about the alleged abuse that her daughter had disclosed to her. Boyd said that A.H. had told both Boyd and her boyfriend, Cooley, at their home that A.H.'s father touches her in her private area and that she touches him in his private area. Boyd also said that A.H. pointed to her private area and said her father used a finger to touch her. (Absent from Boyd's interview with the detective were allegations that would come out later about "white stuff" or "sucking." [Quoting No. 57808-5-II 16 Verbatim Rep. of Proc.] at 561-62, 567-68.)

Several days later, Detective Wilcox interviewed Cooley about A.H.'s behavior and disclosures that she made to him. Cooley said that A.H.'s brother, G.H., told him that A.H. was "trying to pull on his private (no, no)." [Quoting No. 57808-5-II 5 Verbatim Rep. of Proc.] at 210. He said that when Boyd got home, they sat down with A.H., who confirmed what G.H. had reported to Cooley. According to Cooley, A.H. explained that "[her father] touches her like that, and she also touches him because he says it's okay to do it." [Quoting No. 57808-5-II 5 Verbatim Rep. of Proc.] at 211. (Like Boyd's interview, certain allegations that came out later were absent from Cooley's interview with the detective, including whether or not Cooley actually witnessed A.H. touch G.H. on the "inner thigh area," and any mention about "yogurt." [Quoting No. 57808-5-II 5 Verbatim Rep. of Proc.] at 201; [quoting No. 57808-5-II 15 Verbatim Rep. of Proc.] at 515.)

*Id.* at 240-41 (some alterations in original).

During the investigation, two semen stains were found on the cover of the small mattress upon which AH slept when she spent nights with Houser in his garage. *Id.* at 241. The semen was DNA tested and the DNA matched Houser's DNA. *Id.*

### III. CHARGES AND DEFENSE INTERVIEW OF AH

The State charged Houser with three counts of first degree child molestation and one count of second degree incest. The State alleged that each offense occurred on or between AH's birthdate, October 7, 2013, and February 9, 2020, when AH was six years old.

A few months after the State filed the charges, defense counsel interviewed AH. *Id.* During this interview, some of AH's statements were inconsistent with her prior disclosures. *Id.* "For example, A.H. said that her father 'never touched' her. [ ] When defense counsel asked the follow-up questions, 'He never did? Did you ever tell anybody that your dad touched your private areas?' A.H. responded, 'No.' [ ]." *Id.* at 241-42 (citations omitted) (quoting No. 57808-5-II Ex. 52). This interview was recorded. *Id.* at 242.

### IV. CHILD COMPETENCY AND CHILD HEARSAY HEARINGS

A. HEARING TESTIMONY AND ARGUMENT

On June 30, 2022, and July 1, 2022, more than two years after AH's initial disclosures, the trial court held a pretrial hearing to address AH's competency and to assess the child hearsay statements. AH, who was then eight years old; Boyd; Cooley; Arnold; and Breland testified in person at this hearing.[3]

Houser's direct appeal summarized the hearing testimony as follows:

---

[3] AH, Boyd, and Cooley were brought in from out of state to testify at this hearing.

A.H. began by testifying generally about events in her life, including taking trips to the San Juan Islands. She remembered collecting small yellow rocks on these trips with her grandmother.

A.H. was then asked about incidents with her father. When the State asked her if she remembered something "bad" had happened to her, she said, "Yes." [ ] A.H. remembered she and Houser were playing games and then going to bed, but she did not appear to remember any abuse or specifics of what happened because she was sleeping. But A.H. felt the bed shaking.

A.H. was unclear about other details as well. She testified that she slept on the same bed as Houser and Houser's girlfriend, Michelle Molina, in the *basement* (not garage) of Houser's "friend's kind of uncle's house"; however A.H. could not remember Molina's name. [ ] (But she recalled that Houser lived in a structure that was "a little bit farther from the real house." [ ]). When A.H. was asked how old she was when the abuse occurred, A.H. said she was "either 7" or "about to turn 8" even though she was 6 years old when she made the disclosures. [ ] A.H. also did not appear to remember her forensic interview with Arnold, including that a child-interview facility dog was present.

After A.H. testified, the evidentiary hearing continued with testimony from Boyd. Boyd was first asked about A.H.'s testimony concerning trips to the San Juan Islands—Boyd confirmed that those trips occurred, although the question was vague about the timing. (The State asked, "*At any point in time or in 2020*, were you going on trips to the San Juan Islands?" [ ] (emphasis added). Boyd answered, "Yes." [ ]

Boyd was then asked about A.H.'s disclosures of the alleged abuse. In this area, Boyd's testimony differed somewhat from her earlier interview with Detective Wilcox. Whereas earlier Boyd told the detective that A.H. had disclosed the abuse to both her and Cooley at their home, Boyd testified at the hearing that A.H. did not actually make any disclosures about the abuse to her. Instead, Boyd claimed she learned about the details of the abuse only at the hospital when Cooley told her what A.H. told him. Boyd's testimony also included other facts that she did not mention to the detective, including that Cooley told her at the hospital that A.H. said,

> White stuff comes out of Daddy's private area, and it tastes salty. I hurt down there sometimes.

[ ]

Next, Cooley testified about A.H.'s disclosures. Cooley said after returning from work one day in February 2020, he heard G.H., A.H.'s brother, say, "No,

5

[A.H.]. You don't touch me there." [ ] Cooley said he observed A.H.'s hand on G.H.'s "inner thigh area outside of his pants" (even though he did not previously mention anything to the detective during the investigation about *observing* A.H. touch G.H.). [ ] Cooley then spoke with A.H. and asked her if somebody at her dad's house had touched her; A.H. began "bawling her eyes out" and nodded her head "yes." [ ] Cooley said he then picked up Boyd from work and took A.H. to the hospital.

Both forensic interviewer Arnold and Nurse Breland testified at the evidentiary hearing about the disclosures A.H. made to them during the investigation.

*Houser*, 20 Wn. App. 2d at 242-44 (some alterations in original) (citations omitted) (quoting No. 57808-5-II Verbatim Rep. of Proc. at 165-67, 174, 184-85, 201, 202).

After the witnesses testified, Houser argued that AH was not competent to testify as demonstrated by her own admission that she did not "have an independent memory of the incident" and that she had merely "been repeating what people have told her." 6 Verbatim Rep. of Proc. (VRP) at 223. He also argued that there was no corroborating evidence so the child hearsay should not be admitted.

The State responded that it was Houser's burden to rebut the presumption that AH was competent to testify based upon the five *Allen*[4] factors. The State asserted that the time period at issue was when AH was six years old and related to the events that occurred in Houser's garage, in which Houser had been living since the summer of 2017 when AH was almost four years old.

The State also argued that AH had demonstrated that she had sufficient memory of the facts "of the time surrounding" when the crimes occurred, noting that AH was able to recall that she was staying with Houser, that she recalled being in the bed in the garage, and that she recalled Houser's girlfriend. *Id.* at 233. Houser disputed that AH had sufficient memory, but he did not

---

[4] *State v. Allen*, 70 Wn.2d 690, 692, 424 P.2d 1021 (1967).

dispute that the relevant time period was when the alleged crimes occurred in the garage when AH was six years old.[5]

The trial court stated that it appeared that the key factor was whether AH's memory was sufficient. The trial court further stated that it would allow the parties some additional time to brief the issue and that it would rule on the child competency issue immediately before the beginning of the trial, which was then set for July 5.

The trial court then proceeded to address the child hearsay statements. The State advised the trial court that it was seeking to admit only (1) AH's 2020 disclosures to Cooley, (2) AH's 2020 disclosures to her mother, (3) AH's 2020 disclosures to Arnold, and (4) AH's 2020 disclosures to Breland. The trial court deferred the ruling to allow for additional briefing.

B. TRIAL COURT'S COMPETENCY AND CHILD HEARSAY RULINGS AND TRIAL DELAY

At the July 5 hearing, the trial court delayed starting the trial until July 11, because defense counsel (who appeared remotely) and some of the jurors were ill. But the trial court proceeded to address the child competency and hearsay issues.

"[R]ecounting several of the facts that A.H. remembered around the time frame of the alleged abuse and suggesting that gaps in her memory could be explored during cross-examination," the trial court ultimately determined that AH was competent. *Houser*, 20 Wn. App. 2d at 245. Specifically, the trial court stated,

> I would also observe that it's not that A.H. didn't have any memory of any of the circumstances surrounding the complained of incident.
>
> She recalls going to the garage. She recalls sleeping on a bed next to her father. She stated she went to sleep and doesn't remember what happened after that.

---

[5] In his trial court briefing, Houser never asserted that the trial court could not find AH competent because the time of the alleged abuse had not been identified.

> I mean, I'm paraphrasing her, but that will certainly allow you the opportunity to cross-examine and develop facts, which, as I understand it from the child hearsay hearing, the child competency hearing, would result in her basically acknowledging she has no memory of what happened after she went to sleep. That is cross-examination.

7 VRP at 271.

The trial court then addressed whether AH's disclosures to Boyd, Cooley, Arnold, and Breland were admissible as child hearsay. "The trial court ultimately determined that A.H.'s statements to all four witnesses met the requirements for admissible child hearsay." *Houser*, 20 Wn. App. 2d at 246.

## C. CHILD COMPETENCY AND CHILD HEARSAY FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial court entered written findings of fact and conclusions of law regarding its child hearsay and child competency decisions.

In its written competency findings, the trial court did not set out specific dates for the alleged abuse. But it did find that AH had reported that Houser had been inappropriately touching her during the time she was sleeping in the garage with her father and his girlfriend. And the trial court concluded that AH was able to receive an accurate impression of the abuse at the time of that abuse.

In the trial court's written competency findings of fact, the trial court included additional details from AH's testimony regarding the trips to the San Juan Islands in its conclusion regarding the sufficiency of AH's memory of events that occurred contemporaneous with the abuse:

> 11. A.H. recalled events that happened contemporaneously with the alleged abuse. A.H. remembered something "bad" had happened at her father's, while A.H., defendant, and defendant's girlfriend were on a bed in defendant's garage. A.H. recalled trips to San Juan Island with her "Harmony." She recalled collecting small yellow rocks with Harmony and putting them into a jar. A.H. remembered that

> during the trips, they would stay at Harmony's friend's house – a man she knew as "Uncle Joe."
>
> 12. Ms. Boyd testified that shortly after February 19, 2020, A.H. stayed with Ms. Boyd's mother, Suk Boyd. A.H. referred to Suk Boyd as "Harmony," because that is the Korean version of grandma. While A.H. stayed with her grandma, they would go on trips to a place that A.H. knew as "San Juan Island." During those trips, they would collect Agate rocks with A.H.'s grandma. They would also stay at her grandmother's boyfriend's house.

[ ]

> The trial court's relevant conclusions of law regarding A.H.'s competency state:
>
> 4. At the time of the alleged abuse, A.H. had the mental capacity to receive an accurate impression of the abuse.
>
> 5. A.H. has a sufficient memory to retain an independent recollection of the alleged abuse.
> . . . .
>
> 9. This court finds A.H. competent to testify as a witness in this case at trial.

[ ]

> As for child hearsay, the trial court issued a separate written order that outlined the factors applied by the court and determined that A.H.'s February 2020 disclosures to Boyd, Cooley, Arnold, and Nurse Breland would be admissible child hearsay.

*Id.* at 246-47 (citations omitted) (quoting No. 57808-5-II Clerk's Papers at 206-07).

V. MATERIAL WITNESS WARRANT AND REMOTE TESTIMONY DISCUSSIONS

The trial was further delayed because both defense counsel and Houser contracted COVID. Boyd and Cooley, who had come in from out of state, were permitted to return home at some point during the delay. AH remained in Washington with her grandmother.

On July 8, the State was advised that Boyd and Cooley did not intend to return to Washington to testify. The State warned Boyd that if they refused to return, material witness warrants could be obtained. The State did not immediately report this situation to the court because it thought the threat that material witness warrants could be obtained would be sufficient to obtain Boyd's and Cooley's compliance with the subpoenas. But on July 19, the State advised the trial court and Houser that Boyd and Cooley had just advised the State the previous day that they would not return for the trial.

The State also advised the trial court and Houser that it had decided not to seek material witness warrants for these witnesses. The trial court advised Houser that if he wanted to call these witnesses, he could seek a material witness warrant. Houser initially requested material witness warrants for Boyd and Cooley.

The next day, the parties discussed the possibility that Houser would seek to introduce portions of the transcripts from Boyd's and Cooley's testimonies at the child competency/hearsay hearing to impeach AH if Boyd and Cooley did not testify. Houser's counsel stated that he believed that Boyd and Cooley would provide testimony that would demonstrate that they had made inconsistent disclosures and they were biased against Houser. The trial court cautioned Houser that although some of the statements Houser was considering might be admissible for impeachment purposes, significant portions of what Houser was considering would be inadmissible hearsay. The trial court invited the parties to provide briefing on the admissibility of the transcripts from the prior proceedings.

The following day, July 22, defense counsel presented a declaration in support of Houser's motion seeking material witness warrants in which counsel stated, "The defense has endorsed Ms.

Boyd and Mr. Cooley as witnesses based on the defense's witness list." Clerk's Papers (CP) at 196. In his witness list, Houser had expressly incorporated the State's witness list, which included Boyd and Cooley.

The trial court granted Houser's request for the material witness warrants for Boyd and Cooley. But the trial court also stated that because it was unlikely that Boyd and Cooley could be brought to court by the close of testimony, it had offered Houser the opportunity have Boyd and Cooley testify remotely. The trial court directed the parties to confer about the possible remote appearances.

Defense counsel responded that Houser was not going to pursue the material witness warrants because it was too complicated and did not guarantee the witnesses' appearances. Instead, defense counsel agreed to discuss remote appearances with the State.

During the course of the trial, Cooley and then Boyd appeared remotely.[6] After Cooley's testimony, the State advised the trial court "that the Defense has not objected to [ ] Boyd and [ ] Cooley appearing via [Z]oom for this trial." 15 VRP at 537. The trial court commented that there was nothing else they could do because the witnesses would not have arrived in time.

Defense counsel responded,

That's right, Your Honor. As the Court knows, I made a record that I wanted them here in person. They could not come. We got a material witness warrant and then discussed the timing and how they would get here.

I saw no reasonable alternatives, especially given the Court's latitude in discovery and the presenting testimony, *so I did not and I am not objecting to the [Z]oom testimony*, despite the fact that I would have preferred in courtroom testimony.

---

[6] Their testimonies are described below.

11

*Id.* (emphasis added).

## VI. STATE'S EVIDENCE

### A. ARNOLD'S TESTIMONY

Arnold was the State's first witness. The direct appeal summarized her testimony as follows:

> Forensic interviewer Arnold testified that A.H. told her at her interview that her father "touched where he wasn't supposed to" when she was sleeping and that he did not want people to know about it. [ ] [AH] also pointed between her legs to indicate where it hurt. A video recording of the forensic interview with A.H. was admitted into evidence, and the State played portions of the video for the jury.

*Houser*, 30 Wn. App. 2d at 248 (citation omitted) (quoting No. 57808-5-II 13 Verbatim Rep. of Proc. at 429).

### B. AH'S TESTIMONY

The State called AH to testify. "A.H.'s trial testimony was less detailed than her testimony at the evidentiary hearing." *Id.*

After asking some general questions and establishing that AH could differentiate between a lie and the truth, the State asked AH about her grandmother. AH testified that she was currently staying with her grandmother and that she enjoyed going to the San Juan Islands to gather agates on the beach with her grandmother.

The State then asked AH if she knew why she was in court, and AH responded that she was there "to talk to [the deputy prosecutor] about [her] dad." 15 VRP at 490. When the State then asked, "And what about your dad?", AH responded, "About stuff that he did to me." *Id.* at 491. When the State asked AH what her father had done, AH did not make a verbal response.[7]

---

[7] There is no description of any physical response in the transcript.

The State then asked AH what she remembered about where her father used to live. AH stated that he had lived in a house with his uncle. But AH was unable to identify or recall several photographs of the area her father had been living in.

AH was able to recall that she shared time with both her parents and that she had moved between their residences. When the State told her that it understood that something had happened in the bed when she was staying with her father, AH replied that she did not remember anything. AH also testified that she did not recall something happening in a bed or the bed shaking.

The State then asked AH if she had just testified that she was there to talk about what her father had been doing to her, and AH responded, "Yeah." *Id.* at 494. The State asked if the deputy prosecutor was the only person whom she had told about what her father was doing, and AH initially said, "Yes." *Id.* But, without specifying what she had said, AH then testified that she also recalled telling Cooley and her mother about what had happened. AH could not, however, recall what happened when she told her mother. But she did recall going to a doctor and going to a place where she got to sit on a couch with a dog.

When the State again asked AH what her father had been doing to her, AH responded that she did not remember. AH later testified that she was nervous.

On cross-examination, AH testified that she did not remember previously talking with defense counsel and that she did not remember her father doing anything to her.

On redirect, the State again asked AH whether something had happened with her father. This time, AH responded, "Yes." *Id.* at 502. But when the State asked AH what had happened, AH again did not give a verbal response.[8]

---

[8] Again, there is nothing in the transcript regarding whether AH gave a nonverbal response.

When the State asked AH if she knew that what her father was doing to her was wrong when he was doing it, she responded that she did not. When the State asked her how she felt when she found out that what he had been doing was something that he should not have been doing, she responded that she "didn't feel very happy." *Id.* at 502-03. AH also agreed that talking about it made her "feel pretty yucky" and embarrassed. *Id.* at 503. Houser did not ask to re-cross-examine AH.

C. COOLEY'S TESTIMONY

Cooley then testified remotely. The direct appeal summarized Cooley's testimony as follows:

> Consistent with his testimony at the evidentiary hearing (but unlike his conversation with Detective Wilcox), he testified that he saw A.H. touching her brother on the inner thigh close to his genitals. Cooley asked A.H. if she had ever been touched like that and she nodded her head to indicate "yes." [ ] When Cooley asked her whether someone at her father's house touched her like that, she nodded her head yes.
>
> Cooley also testified as to some additional disclosures from A.H. that were not part of either what he had told the detective or what he had testified about at the evidentiary hearing. Specifically, Cooley added a new fact that A.H. told him that she tasted her father's "yogurt." [ ] Cooley explained,
>
>> She just said things like, "At nighttime, he becomes a different person. He's not the same person." She tasted his yogurt, things — honestly, it's hard for me to repeat them because it was very nasty things along the lines of like, you know, at night when she would go to sleep, she would get touched on, and Dad was a different person at night. "He's a monster." She don't like staying nights. "His yogurt doesn't taste good. It doesn't feel good," things along that nature.
>
> [ ]

*Houser*, 30 Wn. App. 2d at 248-49 (citations omitted) (quoting No. 57808-5-II 15 Verbatim Rep. of Proc. at 513, 515).

14

Both parties questioned Cooley about AH's more recent "yogurt" disclosure, emphasizing that this was information that he had not previously disclosed in his interviews. 15 VRP at 515-19. Cooley asserted that the new disclosure was based on statements AH had made after his interview with Wilcox. Houser also cross-examined Cooley about the fact he did not initially disclose seeing AH actually touching GH. Houser did not object to Cooley's testimony about AH's "yogurt" disclosure.

D. BOYD'S TESTIMONY

Boyd then testified remotely. Like Cooley, Boyd added facts to her testimony that had not been previously disclosed. For example, Boyd testified that AH told her that "her dad was sucking her." 16 VRP at 561. Houser did not object to this testimony.

But when the State asked Boyd if she recalled making "some statements regarding recalling other things that [AH] said," and then asked Boyd to describe what she said during the prior hearing, Houser objected on hearsay grounds. *Id.* The trial court overruled the objection, stating: "What [Boyd] said under oath is prior inconsistent testimony. While it is unusual, it is appropriate to impeach with prior inconsistent testimony whether it's your witness or somebody else's witness. The objection will be overruled. And you can inquire, of course." *Id.* at 562.

Boyd then testified that she had previously testified that AH had disclosed that Houser "had made [AH] taste white stuff and he used a finger." *Id.* Boyd explained that when she testified about this at the prior hearing, she mistakenly thought that that disclosure was part of the original disclosures, but she later realized that it was a later disclosure by AH.

15

Boyd was also questioned about AH's trips to the San Juan Islands. Boyd acknowledged that these trips continued well after 2020, something that was not necessarily clear during the prior evidentiary hearing.

During her testimony, Boyd also disclosed that she had memory issues caused by a car accident and that she had difficulty recalling exact dates and when events occurred.[9] She agreed that her memory of AH's disclosures was probably more accurate shortly after the incident than it was at trial.

On cross-examination, Boyd testified that when AH had disclosed the abuse, she did not say how many times it had occurred but "she said [it] was a lot." *Id.* at 566. Boyd also agreed that prior to AH's disclosures, Boyd and Houser had been in conflict over the amount of time AH would spend with each parent.

E. Wilcox's Testimony and Clark's Testimony

Wilcox then testified about seizing the mattress cover from AH's small mattress located in Houser's garage residence. Forensic scientist Marion Clark later testified that the mattress cover contained two stains containing semen. The DNA in one of the semen stains matched Houser's DNA. Houser later testified that these were his semen stains.

F. Breland's Testimony

Breland also testified for the State. She testified about her physical examination of AH following her forensic interview and the statements that AH had made to her during this examination. Regarding AH's statements to her, Breland testified:

> I just explained to her that I was going to give her body a checkup, but before we
> did the checkup there were some things that I wanted to know about her. I asked

---

[9] The testimony regarding Boyd's memory issues is described in more detail below.

her if she knew why she had come today. She told me she was here because of her dad touching her.

I asked her Dad's name. She told me Kevin. I asked her to tell me more about what happened with her dad, and she said he was touching her in places that he wasn't supposed to.

I asked her what those places are, and she pointed to her genital area. I then asked her if she had talked to Keri, who was the interviewer that day, about that. She told me that she had. I let her know that I had talked to Keri so I knew about that conversation. I also told her there were things that I understood that she didn't want to talk about, and she told me it feels bad. I told her we didn't talk to talk [sic] about those things, and so we kind of went on.

. . . .

I asked her about broken bones. She told me she hadn't had any broken bones. I asked her if she ever had to spend the night in the hospital. She told me she had from when her dad was touching her everywhere.

*Id.* at 638-39. Breland believed AH's reference to the hospital stay was actually to the emergency room visit following AH's initial disclosure.

## VII. DEFENSE MOTION TO DISMISS

After the State rested, Houser challenged the State's evidence for each count, stating:

At this time, given the lack of specificity with regard to the multiple counts of child molestation, I would ask the State which count they're relying on and what evidence there was for the specific counts.

The testimony was so vague that there was just insufficient evidence to proceed on the multiple counts of child molestation.

*Id.* at 644.

The State responded that there was sufficient evidence to support multiple counts of child molestation. The State relied on the fact there were two semen stains on the mattress and the fact AH's description of the acts were always in terms that implied multiple acts rather than a singular act. When the trial court questioned the State about the time frame, the State argued that there was

no testimony that pointed to any specific time frame but that "the way that this disclosure happened and the age of the child would indicate that it happened some time -- just however long her memory went back to -- because the only disclosure that we have here was made when she was 6." *Id.* at 645-46.

The trial court noted that "there [was] that discrete episode that was described by Mr. Cooley and Ms. Boyd where [AH] was allegedly touching her older brother and they went on. 'That's what Dad does,' and all of that, so there is that discrete time, which sounded to me like fairly recent." *Id.* at 646. Houser responded that he agreed that there was potential support for one count, but he argued that there was no support for any other instances other than AH's occasional "use of plurals." *Id.*

The trial court responded,

Plural does mean more than one. I have to keep in mind that this is a 6-year-old girl at the time of the disclosure who may be talking about events that happened a year or two before. That's an eternity for her, and there's no way that she can keep track.

I certainly will allow you liberal argument about the fact there is no other specific even described. [Defense counsel] can talk about the plural and the length of the charging period, and, of course, we do the sort of culminating episode in February of 2020.

I think that there is enough there to at least make a prima facie argument. Whether it turns out that it's one contact or three, we'll see.

*Id.* at 646-47.

VIII. HOUSER'S EVIDENCE AND TESTIMONY

Houser then presented his defense.

A. AH'S DEFENSE INTERVIEW

Houser initially played audio recording of AH's interview with the defense for the jury. During this interview, there were points where AH denied any inappropriate touching or telling anyone about any inappropriate touching.

B. MOLINA'S TESTIMONY

Michelle Molina, Houser's former girlfriend, testified for the defense.

She testified that starting around midsummer in 2017, she and Houser were living in the garage. Around that time, AH was five years old and was visiting Houser every other weekend. At the time she and Houser were sleeping on the floor in blankets and sleeping bags, but they had a small bed for AH. Molina testified that she would also sleep on the small bed and that she and Houser had had sex on the bed.

C. HOUSER'S TESTIMONY

Houser also testified. The direct appeal summarized his testimony as follows:

Houser testified and denied molesting A.H. He said he lived in a garage that was next to a house where some of his family lived. Houser denied *sleeping* on the same mattress with A.H. and his girlfriend, Molina, but he acknowledged that, at times, all three were on the larger mattress in the garage at night. Houser acknowledged that the small mattress that A.H. slept on was only taken down from the wall and used by her only at night. During cross-examination, the State asked Houser about his sexual preferences. For example, the State asked, "You prefer petite women, correct?" [ ] Houser responded, "Correct." [ ] Houser did not object to the question.

Despite Houser's earlier testimony that A.H.'s small mattress was taken down from the wall and used by her only at night, Houser claimed that he had sex with Molina on A.H.'s small mattress before he got a larger mattress. But after getting a larger mattress, he could not remember if he had sex with Molina on A.H.'s mattress again.[ ] Specifically, when asked whether he would remember

having sex on his daughter's bed, Houser discussed how he lived an explorative sexual life as part of the "kink community":

> [Prosecutor]: Is that something that you would remember, having sex, whether you had sex on your daughter's bed or not?
>
> [Houser]: At the time, honestly, I couldn't say. I live a very explorative sexual life. I'm a member of [the] kink community, so remembering exactly everything is kind of a lot to remember.
>
> [Prosecutor]: You would agree that having sex on your daughter's bed is something that should be memorable; is that correct?
>
> [Houser]: Yes.

[ ] Houser did not object to either of these questions.

*Houser* 30 Wn. App. 2d at 250-51 (some alterations in original) (citations omitted) (quoting No.

57808-5-II 16 Verbatim Rep. of Proc. at 691).

## IX. JURY INSTRUCTIONS

After the parties rested, the trial court gave the jury the following instructions:

> A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

CP at 226.

> The State alleges that the defendant committed acts of child molestation in the first degree on multiple occasions. To convict the defendant of Count One - child molestation in the first degree - one particular act of child molestation in the first degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed every alleged act of child molestation in the first degree.
>
> The State alleges that the defendant committed acts of child molestation in the first degree on multiple occasions. To convict the defendant of Count Two - child molestation in the first degree - one particular act of child molestation in the first degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed every alleged act of child molestation in the first degree.

20

The State alleges that the defendant committed acts of child molestation in the first degree on multiple occasions. To convict the defendant of Count Three - child molestation in the first degree - one particular act of child molestation in the first degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed every alleged act of child molestation in the first degree.

*Id.* at 231.

In addition, each of the to-convict instructions for the first degree child molestation counts stated that each count was "separate and distinct from those acts alleged" in each of the other two counts. *Id.* at 232, 233.

The trial court also gave a unanimity instruction addressing the incest charge.[10]

X. JUROR ISSUE

Immediately before closing argument, the trial court expressed concern about the ability of one of the jurors, "Juror 11," to participate in deliberations because it had observed that Juror 11 had continually exhibited problems following or remembering simple directions or instructions, such as where and when to enter the courtroom and that the juror's notepad had to be turned down when they were absent from the jury box, despite being in the courtroom for a week and a half. The trial court proposed seating Juror 11 as an alternate. Defense counsel agreed that he had concerns about Juror 11's ability to follow directions, and both parties agreed to the trial court's proposed solution and waived "any claim of error strictly related to dismissing Juror No. 11 and having her serve as an alternate." 17 VRP at 741-42.

In light of this change, "Juror 13" became a deliberating juror. Juror 13 had, following opening arguments, disclosed that they may have had some contact with Boyd as a teacher, but the

---

[10] This instruction is described in more detail below.

trial court permitted Juror 13 to remain on the jury. The facts related to this event are provided in more detail below.

## XI. CLOSING ARGUMENTS

### A. STATE'S CLOSING ARGUMENT

In its closing argument, the State argued, "As you heard throughout this trial, the Defendant would lay down his 4 to 6-year-old daughter in the garage where he slept, he would snuggle with her, he would touch her vagina, and he would have her touch him." *Id.* at 743.

When discussing the to-convict instructions, the State noted the entire date range of October 7, 2013 through February 9, 2020. But it then commented that although the range started in October 2013, "[t]he State is alleging that these acts would have taken place within a range that [AH] would have been able to remember when she reported in February of 2020 because it's based upon her memory and her reports on that date." *Id.* at 748. The State then added, "You can use your own reasonable inferences from that. I suggest to you that that would be about two to three years before February of 2020." *Id.*

The State also emphasized that there had been two semen stains on AH's small mattress. When discussing the semen stains, the State argued that the amount of DNA in the samples suggested that the stains were more recent and certainly not two or more years old.

The State then discussed jury instruction 11. It stated that this instruction required the jury to be unanimous that Houser committed multiple separate and distinct acts and that there was evidence that there were at least two sexual acts on the mattress. It also argued that AH's statements showed there were multiple acts because she used terms like, " 'My dad was touching me,' " versus singular terms like, " 'My dad touched me.' " *Id.* at 763.

B. HOUSER'S CLOSING ARGUMENT

In his closing argument, Houser extensively discussed Cooley's testimony and emphasized things such as the intensity of his voice and facial expressions to argue that it was unlikely that he stayed calm when AH disclosed the abuse as he claimed he had. Houser also pointed out various inconsistencies between Cooley's testimony and his statements and argued that this demonstrated that Cooley was not a credible witness. Houser also emphasized inconsistencies in Boyd's testimony and her admission that she had memory issues.

Houser also argued that there was no evidence of discrete and separate acts. He argued that at best there was evidence of one act.[11]

C. STATE'S REBUTTAL

In rebuttal, the State's argument focused on events that occurred from 2018 through 2020, when Houser had access to AH.[12]

## XII. VERDICT

The jury found Houser guilty of two counts of first degree child molestation and one count of second degree incest. It found him not guilty on one count of first degree child molestation.

## XIII. APPEAL AND PERSONAL RESTRAINT PETITION

Houser appealed his convictions and some of his community custody conditions. He argued, inter alia, that the trial court erred when it found that AH was competent to testify and

---

[11] We describe portions of Houser's argument that are relevant to his prosecutorial misconduct claim in more detail below.

[12] We describe the portions of the State's rebuttal argument that are relevant to Houser's prosecutorial misconduct claim in more detail below.

when it admitted her hearsay statements.[13] *Houser*, 30 Wn. App. 2d at 239. In a published opinion, we affirmed his convictions and community custody conditions. *Id.* at 239, 283. Houser's appeal mandated on September 10, 2024. Mandate, *State v. Houser*, No. 57808-5-II (Wash. Ct. App. Sept. 10, 2024).

On August 15, 2024, shortly before his direct appeal mandated, Houser filed this timely personal restraint petition.[14] We appointed counsel and referred the petition to a panel. Ord. Appointing Counsel and Referring to a Panel, *In re Pers. Restraint of Houser*, No. 60768-9-II (Wash. Ct. App. Sept. 19, 2024).

On February 7, 2025, less than a year after the direct appeal mandated, appointed counsel filed a timely supplemental personal restraint petition brief. Suppl. Pers. Restraint Pet. Br., *Houser*, No. 60768-9-II (Wash. Ct. App. Feb. 7, 2025).

## ANALYSIS

### I. LEGAL PRINCIPLES

#### A. PERSONAL RESTRAINT PETITION PRINCIPLES

To prevail in a personal restraint petition (PRP), the petitioner must establish (1) a constitutional error that resulted in actual and substantial prejudice or (2) a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Meredith*, 191 Wn.2d 300, 306, 422 P.3d 458 (2018).

---

[13] We describe these arguments in more detail below.

[14] Houser's judgment and sentence became final when his appeal mandated on September 10, 2024. RCW 10.73.090(3)(b). Although the State and Houser argue extensively about the effect of the time bar, RCW 10.73.090(1), all the briefing in this matter was filed less than a year after Houser's direct appeal mandated, so all the issues raised in Houser's original and supplemental briefs are timely.

The petitioner must show that they have competent, admissible evidence to establish facts that would entitle them to relief. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18, 296 P.3d 872 (2013). Bald assertions and conclusory allegations are insufficient. *Id.* And the factual allegations must be based on more than speculation and conjecture. *Id.* A declaration from the petitioner can support a petition if the declaration is based on personal knowledge. *See In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 481, 965 P.2d 593 (1998); *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). And if the evidence supporting a claim is based on knowledge in the possession of others, the petitioner must present their affidavits with admissible statements or other corroborative evidence. *Rice*, 118 Wn.2d at 886.

In addition, "[i]n PRPs, we ordinarily will not review issues previously raised and resolved on direct review. In order to renew an issue rejected on its merits on appeal, the petitioner must show the ends of justice would be served by reexamining the issue." *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 388, 972 P.2d 1250 (1999).

B. INEFFECTIVE ASSISTANCE OF COUNSEL

To establish ineffective assistance of counsel, Houser must demonstrate that (1) defense counsel's performance was deficient and (2) this deficient performance was prejudicial. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012). If Houser fails to satisfy either prong of this test, we need not consider the other prong. *Id.* at 847.

Counsel's performance is deficient when it "falls 'below an objective standard of reasonableness based on consideration of all the circumstances.' " *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). But "[w]hen counsel's conduct can be characterized as legitimate trial strategy or tactics,

25

performance is not deficient." *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). We presume defense counsel's performance was reasonable. *Estes*, 188 Wn.2d at 458. Thus, the defendant bears the burden of rebutting that presumption by demonstrating that counsel had no legitimate or tactical reason for their conduct. *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021). "Prejudice exists if there is a reasonable probability that 'but for counsel's deficient performance, the outcome of the proceedings would have been different.' " *Estes*, 188 Wn.2d at 458 (quoting *Kyllo*, 166 Wn.2d at 862).

In the PRP context, a petitioner who successfully demonstrates prejudice in an ineffective assistance of counsel claim has necessarily shown actual and substantial prejudice sufficient to obtain collateral relief. *Crace*, 174 Wn.2d at 846-47.

C. PROSECUTORIAL MISCONDUCT

"To prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.' " *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (plurality opinion)).

"We employ one of two tests to determine whether reversal is required based on prosecutorial misconduct." *State v. Gouley*, 19 Wn. App. 2d 185, 200, 494 P.3d 458 (2021). When the defendant has objected to the alleged misconduct below, they need only show "(1) that the prosecutor's [conduct was] improper and (2) that there is a substantial likelihood the misconduct affected the verdict." *Id.* But if the defendant failed to object to the alleged misconduct, the

> defendant waives the prosecutorial misconduct claim unless the defendant shows
> (1) that [the conduct was] improper, (2) that the prosecutor's [conduct was] both

flagrant and ill-intentioned, (3) that the effect of the improper [conduct] could not have been obviated . . . , and (4) a substantial likelihood the misconduct affected the verdict.

*Id.* at 201.

"When a nonobjecting defendant fails to show that the improper [conduct was] incurable, the claim 'necessarily fails, and our analysis need go no further.' " *Id.* (quoting *State v. Emery*, 174 Wn.2d 741, 764, 278 P.3d 653 (2012)). "Moreover, a defendant might succeed in showing incurable prejudice from the improper statements and yet fail to demonstrate a substantial likelihood that the misconduct affected the verdict." *Id.* When "evaluating whether the defendant has overcome waiver in cases where an objection was not lodged, we will 'focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured.' " *Id.* (quoting *Emery*, 174 Wn.2d at 762).

Additionally, "[a] personal restraint petitioner raising a prosecutorial misconduct claim must prove the misconduct was either a constitutional error resulting in actual and substantial prejudice or a fundamental defect resulting in a complete miscarriage of justice." *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 165, 410 P.3d 1142 (2018).

## II. CHILD COMPETENCY

Houser argues that the trial court abused its discretion when it determined that AH was competent to testify. His primary contention is that the trial court could not have found AH competent to testify because it was required to find that she had the mental capacity to receive an accurate impression of the alleged crimes at the time of the crimes, and the State failed to identify when the alleged abuse occurred.

Houser also argues that the trial court abused its discretion in finding AH competent to testify because AH asserted that she was asleep during the alleged abuse and therefore was unable to receive an accurate impression. Additionally, he argues that the trial court abused its discretion when it determined that AH was competent because her memory of contemporaneous events was not sufficient to establish that she had an independent recollection of the events when the trips to the San Juan Islands continued after the alleged crimes.

Houser's first two arguments fail. And we decline to address the third argument because it was raised and addressed on the merits in his direct appeal, and Houser fails to establish that reexamination of this issue is in the interest of justice.[15]

In a related ineffective assistance of counsel claim, Houser also argues that defense counsel provided ineffective assistance of counsel by failing to adequately research and argue cases relevant to AH's lack of competency. This argument also fails.

A. LEGAL PRINCIPLES

Persons "who appear incapable of receiving just impressions of the facts, respecting which they are examined, or of relating them truly[,]" are not competent to testify. RCW 5.60.050(2).

We set out the legal principles applicable for competency determinations in Houser's direct appeal:

> The bar for competency is low; all witnesses, including children, are presumed competent to testify unless proved otherwise by a preponderance of the evidence. *State v. Brousseau*, 172 Wn.2d 331, 347, 259 P.3d 209 (2011). The party

---

[15] The State broadly asserts that all of Houser's arguments pertaining to the trial court's child competency decision should not be considered because Houser challenged that determination in his appeal and Houser fails to show that the interests of justice require relitigation. Although this is true with respect to one of Houser's arguments, Houser's other competency arguments are based on grounds that were not addressed in his appeal, so we may address these arguments without an interests of justice showing. *Gentry*, 137 Wn.2d at 388.

challenging the witness's competency bears the burden of proving incompetency. *Id*. at 343.

The competency of a child witness is evaluated by using specific factors. In . . . *Allen*, our Supreme Court outlined the factors to be employed by trial courts with child witnesses. 70 Wn.2d [at 692]. A child's age is not determinative of their capacity as a witness; five factors (the *Allen* factors) must be found for a child to be declared competent to testify:

> "(1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it."

*In re Dependency of A.E.P.*, 135 Wn.2d 208, 223, 956 P.2d 297 (1998) (quoting *Allen*, 70 Wn.2d at 692).

We give great deference to trial courts on these child competency decisions. *Brousseau*, 172 Wn.2d at 340. " 'There is probably no area of law where it is more necessary to place great reliance on the trial court's judgment than in assessing the competency of a child witness.' " *State v. Woods*, 154 Wn.2d 613, 617, 114 P.3d 1174 (2005) (plurality opinion) (quoting *State v. Borland*, 57 Wn. App. 7, 11, 786 P.2d 810 (1990), *overruled on other grounds by State v. Rohrich*, 132 Wn.2d 472, 939 P.2d 697 (1997)). Deference to the trial court is appropriate because "[t]he competency of a youthful witness is not easily reflected in a written record," and we "must rely on the trial judge who sees the witness, notices the witness's manner, and considers his or her capacity and intelligence." *Id*. We may consider the entire record in reviewing the trial court's determination of competency to testify. *Id*.; *see also Brousseau*, 172 Wn.2d at 340.

Accordingly, we review a trial court's competency determination for an abuse of discretion. *Brousseau*, 172 Wn.2d at 340. A trial court abuses its discretion if its decision is manifestly unreasonable or is exercised on untenable grounds or for untenable reasons. *State v. Borboa*, 157 Wn.2d 108, 121, 135 P.3d 469 (2006).

We review a challenge to a trial court's findings of fact to determine if substantial evidence supports them. [*State v. A.X.K.*, 12 Wn. App. 2d 287, 298, 457 P.3d 1222 (2020)]. "Substantial evidence" is evidence that is sufficient to persuade a fair-minded person of the truth of the premise stated. *Id*. The party challenging the finding of fact bears the burden of demonstrating that the finding is not

supported by substantial evidence. *State v. Smith*, 185 Wn. App. 945, 957, 344 P.3d 1244, *review denied*, 183 Wn.2d 1011 (2015).

*Houser*, 30 Wn. App. 2d at 256-57.

B. SPECIFIC TIME PERIOD

Houser argues that the trial court could not have concluded that AH was competent because the competency determination was dependent on AH having the mental capacity at the time of the alleged abuse to receive an accurate impression of the alleged abuse, and the State failed to specifically allege when the crimes occurred. The record does not support this argument.

Although the charging period was broad, during the child competency hearing the State expressly limited the time period to the period during which Houser was staying in the garage when AH was around six years old. At no point during the hearing or in its briefing on the child competency matter, did Houser assert that the relevant time period was indefinite or spanned the entire charging period. Because the State defined the relevant time period when the trial court made its ruling, Houser does not establish that the trial court's competency determination was an abuse of discretion on this basis.[16]

---

[16] Houser's reliance on *A.E.P.*, is not persuasive. In *A.E.P.*, there was *no* evidence regarding when the alleged abuse occurred, so the trial court could not have determined whether the child had the required mental capacity at the time of the crime. Here, in contrast, during the competency hearing, the State tied the crimes to the events that took place when Houser was living in the garage when AH was around six years old, and the trial court considered evidence of AH's mental capacity during that specific time.

Notably, although *A.E.P.* requires that the trial court must examine the child's mental capacity during the "time period" in which the abuse occurred, it does not require that the child provide specific dates. All that is required is evidence of a contemporaneous ability to receive just impressions at the time of abuse. *A.E.P.*, 135 Wn.2d at 225; *see also Woods*, 154 Wn.2d at 619. "*A.E.P.* reaffirms that a child's ability to receive just impressions at the time of the abuse may be demonstrated by the child's ability to recall events or circumstances occurring before the abuse or during the time period of the abuse." *Woods*, 154 Wn.2d at 619.

C. UNABLE TO RECEIVE AN ACCURATE IMPRESSION

Houser also argues that the trial court could not have found AH competent because she asserted that she was asleep, and therefore mentally incapacitated, during the alleged abuse and was unable to receive an accurate impression. We disagree.

Although there must be some temporal context, if a child can relate contemporaneous events the trial court can infer the child is competent to testify about other incidents that occurred within the same time frame. *A.E.P.*, 135 Wn.2d at 225. The question at issue when determining competency is whether the child had the capacity to receive an accurate impression at the time of the crime, not whether the child witness actually perceived a specific event. Notably, any "inconsistencies and contradictions go to the weight of [the child witness'] testimony, not its admissibility." *State v. Stange*, 53 Wn. App. 638, 642, 769 P.2d 873 (1989). Accordingly, this argument fails.

D. SAN JUAN ISLAND TRIPS

Houser also argues that the trial court could not have found AH's memory of contemporaneous events was sufficient to establish an independent recollection of events because the San Juan Island trips were ongoing. This issue was raised and addressed in his direct appeal, *Houser*, 30 Wn. App. at 260-61, so we will not consider it unless Houser can first "show the ends of justice would be served by reexamining the issue." *Gentry*, 137 Wn.2d at 388.

Houser contends that we should reexamine this issue in light of language in the direct appeal opinion that he construes as equivocal. Specifically, Houser directs us to the following portion of the opinion:

> We acknowledge that A.H.'s memory about events was less than perfect. But
> assessing the competency of a child witness is difficult, and doing so on appellate

record is even more so. *See Woods*, 154 Wn.2d at 617 ("The competency of a youthful witness is not easily reflected in a written record," and we "must rely on the trial judge who sees the witness, notices the witness's manner, and considers his or her capacity and intelligence."); *State v. Kennealy*, 151 Wn. App. 861, 878, 214 P.3d 200 (2009) ("We place particular reliance on the trial court's judgment in assessing a child witness's competency."), *review denied*, 168 Wn.2d 1012 (2010). And here, our record shows that the trial court was thoughtful about this difficult decision, mulling over what was reasonable to expect for a six-year-old's memory, as it balanced the *Allen* factors.[ ]

Under these circumstances, Houser has failed to meet his burden to show that the trial court's resulting conclusion was an abuse of discretion. Under this standard, we "need not agree with the trial court's decision for us to affirm that decision. We must merely hold the decision to be reasonable." *State v. Lile*, 188 Wn.2d 766, 782, 398 P.3d 1052 (2017). We hold that the trial court did not abuse its discretion in concluding A.H. was competent to testify.

*Houser*, 30 Wn. App. 2d at 261-62. He argues that this portion of the opinion demonstrates that "the issue of A.H.'s competency to testify in this case is truly troubling and this [c]ourt would be well justified to reconsider its earlier decision." Suppl. PRP Br. at 8.

But this portion of the direct appeal opinion is not equivocal or troubling. It is a statement of the standards that apply when considering a trial court's child competency ruling and an acknowledgement that, because the trial court can observe the testimony firsthand, the trial court's ruling is entitled to deference even when there might otherwise be some room for disagreement. This does not demonstrate that the direct appeal decision is troubling or that it is in the interest of justice to reconsider the issue already raised and addressed on the merits in the appeal. Accordingly, we decline to further address this claim.

In summary, Houser fails to show that the trial court erred when it found that AH was competent to testify.

E. RELATED INEFFECTIVE ASSISTANCE OF COUNSEL

Houser also argues that defense counsel provided ineffective assistance by failing to adequately research and argue cases relevant to AH's lack of competency. But Houser does not state what additional research would have revealed or cite to any case law that defense counsel failed to consider or argue. Without this additional information, we cannot consider whether defense counsel's performance was deficient or resulted in prejudice. Accordingly, this ineffective assistance of counsel argument fails.

## III. CHILD HEARSAY

Houser next argues that the trial court erred when it admitted the child hearsay statements because (1) AH had a motive to lie; (2) AH's initial disclosure was not a spontaneous statement made following a visit with Houser; (3) AH was unable to testify about the alleged incidents and could provide only general testimony that suggested an alleged continuing course of conduct; (4) AH proved unable to testify at trial, rendering her unavailable to testify, and the trial court failed to make a finding that there was corroborating evidence; and (5) it failed to individually evaluate the reliably of certain child hearsay statements. Houser also raises a related prosecutorial misconduct claim. These arguments fail.

A. LEGAL PRINCIPLES

"We review a trial court's decision to admit child hearsay statements for an abuse of discretion." *Kennealy*, 151 Wn. App. at 879. A trial court abuses its discretion when its ruling is manifestly unreasonable or is based on untenable grounds or reasons. *Id.* The erroneous admission of testimonial hearsay is a constitutional error; the erroneous admission of nontestimonial hearsay

is a nonconstitutional error. *State v. Watt*, 160 Wn.2d 626, 633, 160 P.3d 640 (2007); *State v. Alvarez-Abrego*, 154 Wn. App. 351, 369, 225 P.3d 396 (2010).

RCW 9A.44.120,[17] the child hearsay exception, provides that statements made by a child under the age of 10 "describing any act of sexual contact performed with or on the child by another" that is not otherwise admissible under another statute or court rule, is admissible in a criminal proceeding if (1) the trial court determines "that the time, content, and circumstances of the statement provide sufficient indicia of reliability[,]" and (2) the child either testifies at trial or, if the child is unavailable as a witness, "there is corroborative evidence of the act."

To determine whether a child's statements are reliable, the trial court must consider the nine reliability factors first set out in *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984) (plurality opinion). The *Ryan* factors are:

> (1) whether there is an apparent motive to lie, (2) the general character of the declarant, (3) whether more than one person heard the statement, (4) the spontaneity of the statements, (5) the timing of the declaration and the relationship between the declarant and the witness, (6) whether the statement contained express assertions of past fact, (7) whether the declarant's lack of knowledge could be established through cross-examination,[ ] (8) the remoteness of the possibility of the declarant's recollection being faulty, and (9) whether the surrounding circumstances suggested the declarant misrepresented the defendant's involvement.

*Kennealy*, 151 Wn. App. at 880 (footnote omitted). These factors must be substantially met to establish reliability. The trial court's reliability assessment should be based on an evaluation of all the factors, and no single factor is determinative. *Id.* at 881.

"We review challenges to findings of fact to determine whether substantial evidence supports each challenged finding, and we review the trial court's conclusions of law de novo to

---

[17] The legislature amended this statute in 2024. LAWS OF 2024, ch. 298 § 17. Because this amendment is not relevant to this case, we cite to the current version of the statute.

determine whether the findings support the challenged conclusions." *A.X.K.*, 12 Wn. App. 2d at 298.

B. *RYAN* FACTORS

1. MOTIVE TO LIE

Houser argues that AH's statements were not reliable because AH had a motive to lie. He contends that AH had a motive to lie because she was trying to avoid punishment after having been caught touching GH inappropriately.[18] Houser is correct that there is a possibility that AH's initial disclosures to Cooley could have been an attempt to deflect attention from her inappropriate behavior with GH because Cooley testified that he had interrupted the inappropriate behavior, separated the children, sent AH to her room before talking to her, and AH was initially reluctant to respond to Cooley. Although the trial court considered the context in which AH's statements were made, the trial court did not acknowledge that AH may have had a motive to lie when she made her initial statement to Cooley when it concluded that AH had no apparent motive to lie.

This could weigh against the admissibility of AH's disclosures to Cooley. But this was just one factor. And AH's continued allegations in her later statements, which were not made when she was being questioned about her behavior with GH, weighed against a finding that AH was lying to avoid the consequences of touching GH. The totality of the circumstances surrounding

---

[18] Houser also asserts that Cooley presented three different versions of the circumstances under which AH had disclosed the abuse. In his supplemental PRP brief, he also asserts that Boyd's and Cooley's statements were inherently untrustworthy and should not have been admitted. But as noted in Houser's direct appeal, this type of claim relates to Cooley and Boyd's reliability, which is not a factor that the trial court must consider when determining whether *AH's disclosures* were reliable. *Houser*, 30 Wn. App. 2d at 269.

AH's disclosures to Cooley, including her consistent later disclosures, do not suggest that the initial disclosures were unreliable.

Furthermore, any initial motive to lie would not have affected AH's statements to anyone other than Cooley. Houser does not show that the outcome of the trial would have differed if only the statements to Cooley had been excluded. Thus, Houser cannot establish prejudice on this basis and this argument fails.

2. SPONTANEITY

Houser also argues that AH's initial disclosure to Cooley was not reliable because it was not a spontaneous statement following a visit with Houser. Even presuming, but not deciding, that this argument has merit, Houser cannot establish prejudice because he does not challenge any of AH's other disclosures on this basis and the omission of only AH's initial disclosure to Cooley would not likely change the outcome of the trial. Because Houser cannot establish prejudice on this basis, this argument fails.

3. INABILITY TO RELATE SPECIFICS

Houser also appears to argue that AH's statements were not reliable because AH was unable to testify about the individual incidents. Although Houser argued during the child competency/child hearsay hearing that AH was not competent to testify because she had no independent recollection of the incident, he did not argue that her inability to recall the incidents demonstrated that she was not reliable. Because Houser did not raise this issue in the trial court, we decline to address it. RAP 2.5(a).

C. AVAILABILITY

Relying on *Rohrich*, 132 Wn.2d 472, Houser further argues that his Sixth Amendment right to confrontation was violated when AH proved unable to testify at trial about the alleged abuse and was therefore unavailable as a witness.[19] Houser also appears to argue that the trial court was required to make an additional finding that there was corroborating evidence under RCW 9A.44.120(1)(c)(ii) because AH was essentially unavailable as a witness at trial. These arguments fail.

*Rohrich* is not dispositive. "In *Rohrich*, the State did not question the child witness about the alleged acts, thereby preventing the defendant from cross-examining her." *State v. Williams*, 137 Wn. App. 736, 744, 154 P.3d 322 (2007) (citing *Rohrich*, 132 Wn.2d at 474). Because the child witness was never questioned about the alleged acts, the defendant was convicted solely on the basis of the child's hearsay statements. *Id.* (citing *Rohrich*, 132 Wn.2d at 475). Our supreme court reversed, holding that the State's failure to draw out any testimony from the child witness precluded cross-examination of the child and violated the defendant's confrontation rights. *Rohrich*, 132 Wn.2d at 478. Here, in contrast, AH was questioned about the alleged acts and her prior statements, and Houser was able to cross-examine her.

This case is more similar to *State v. Clark*, 139 Wn.2d 152, 985 P.2d 377 (1999). In *Clark*, our supreme court stated that "the admission of hearsay statements will not violate the confrontation clause if the hearsay declarant is a witness at trial, is asked about the event and the hearsay statement, and the defendant is provided an opportunity for full cross-examination." *Id.* at

---

[19] Houser argued in the trial court that AH was unavailable as a witness because she was unable to testify about the specific incidents and that corroborating evidence was required before her hearsay statements could be admitted.

159. And that is what happened here. At trial, AH was questioned about the alleged incidents and her statements on direct examination, and Houser had an opportunity to cross-examine her about the allegations and her statements. Unlike *Rohrich*, the State did not avoid asking AH about the alleged acts or statements, nor did it prevent Houser from having a full cross-examination of her.

Accordingly, Houser's claims that his right to confront AH under the Sixth Amendment was violated and that the trial court was required to make an additional finding that there was corroborating evidence under RCW 9A.44.120(1)(c)(ii) because AH was essentially unavailable as a witness fail.

## D. LACK OF INDIVIDUAL RELIABILITY DETERMINATIONS

Houser also argues that the trial court erred by not evaluating the reliability of each individual child hearsay statement. He specifically identifies (1) Boyd's testimony at the child hearsay hearing, in which she referred to AH telling her that " '[w]hite stuff comes out of Daddy's private area, and it tastes salty. I hurt down there sometimes,' " 5 VRP at 184-85; (2) Cooley's trial testimony about Houser's " 'yogurt,' " 15 VRP at 515; and (3) Boyd's trial testimony that A.H. told her that " 'her dad was sucking her,' " 16 VRP at 561. Suppl. PRP Br. at 23-24, 25, 27-30.

Houser appears to argue that the disclosures that Boyd and Cooley revealed for the first time in their hearing and trial testimonies should not have been admitted because they were never individually evaluated under the *Ryan* factors. But Houser did not object to any of this testimony, so we will not consider this argument. RAP 2.5(a).

Houser also appears to assert that at least some of the statements revealed by Boyd should not have been admitted because it was clear that Boyd lied during the child hearsay hearing and

because "the circumstances of [their] trial testimony" did not indicate reliability. Suppl. PRP Br. at 30. But this is essentially the same argument addressed on appeal, and Houser does not establish that it is in the interest of justice to reexamine this issue.

E. RELATED PROSECUTORIAL MISCONDUCT CLAIM

Relying on *Rohrich*, Houser further argues that the State engaged in prosecutorial misconduct when it failed to elicit direct testimony from AH that was sufficient to permit cross-examination of AH. Although, as discussed above, a prosecutor's failure to question the witness about the alleged acts can amount to a confrontation clause violation, it does not establish misconduct. Accordingly, this prosecutorial misconduct claim fails.

IV. SUFFICIENT EVIDENCE OF MULTIPLE ACTS

Houser further argues the State failed to prove the multiple first degree child molestation charges because it presented only generic testimony that did not establish separate acts.[20] He appears to assert that, at best, the State proved only one count based on a continuous course of conduct. Houser also raises a related ineffective assistance of counsel claim. These arguments fail.

A. SUFFICIENCY

1. LEGAL PRINCIPLES

When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *State v. Joy*, 121 Wn.2d 333, 338, 851

---

[20] Houser also argues that the State engaged in prosecutorial misconduct when it relied on generic testimony and failed to provide evidence of a more definite time period or more clearly establish each separate and distinct act. Although this is presented as a prosecutorial misconduct claim, it is better considered as part of Houser's sufficiency argument.

P.2d 654 (1993); *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). An insufficient evidence claim "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201.

Washington courts have affirmed multiple-count sexual assault convictions "notwithstanding the State's reliance on 'generic' child testimony." *State v. Hayes*, 81 Wn. App. 425, 435, 914 P.2d 788 (1996); *see also State v. Jensen*, 125 Wn. App. 319, 327-28, 104 P.3d 717 (2005); *State v. Brown*, 55 Wn. App. 738, 747-48, 780 P.2d 880 (1989). In *Hayes*, the court reasoned that ruling generic testimony to be inadequate "risks . . . immunizing from prosecution" the most egregious offenders who subject young victims to multiple assaults who might be incapable of providing extensive detail. 81 Wn. App. at 438.

"In sexual abuse cases where multiple counts are alleged to have occurred within the same charging period, the State need not elect particular acts associated with each count so long as the evidence 'clearly delineate[s] specific and distinct incidents of sexual abuse' during the charging periods." *Id.* at 431 (alteration in original) (quoting *State v. Newman*, 63 Wn. App. 841, 851, 822 P.2d 308 (1992)). And "[t]he trial court must also instruct the jury that they must be unanimous as to which act constitutes the count charged and that they are to find 'separate and distinct acts' for each count when the counts are identically charged."[21] *Id.* (quoting *State v. Noltie*, 116 Wn.2d 831, 842-43, 809 P.2d 190 (1991)).

To strike a balance between the defendant's due process rights and the young accuser's limitations, the court in *Hayes* also set out a three-part test to determine if generic testimony is

---

[21] The trial court complied with the requirement to properly instruct the jury. *See* CP at 231, 228, 232, 233.

sufficient to support convictions for multiple assaults. *Id.* at 438. At a minimum, the court required that the victim must be able to describe (1) the kind of act or acts with sufficient specificity for the jury to determine which offense, if any, has been committed; (2) the number of acts committed with sufficient certainty to support each count alleged; and (3) the general time period in which the acts occurred. *Id.* Houser challenges only the second prong to the *Hayes* test; he argues that the evidence was insufficient to establish more than one act.

2. PROOF OF MULTIPLE ACTS

To prove first degree child molestation, the State had to prove that Houser had "sexual contact" with AH. RCW 9A.44.083(1).[22] " 'Sexual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010(13).[23] Here, the evidence, taken in the light most favorable to the State, shows more than one distinct act of sexual contact during the charging period.

Boyd's testimony about AH's disclosures established that AH had told Boyd that Houser had been touching her in her "private" area and that he did this "a lot." 16 VRP at 564, 566. Taking this testimony in the light most favorable to the State, this evidence is sufficient evidence to show that Houser had at least twice touched an intimate portion of AH's body. And the evidence that AH had disclosed seeing and tasting her father's ejaculate, along with the two semen stains containing Houser's DNA on AH's mattress cover provides sufficient evidence that this touching was done for the purpose of gratifying Houser's sexual desire.

---

[22] The legislature amended this statute in 2021. LAWS OF 2021, ch. 142 § 5. Because this amendment is not relevant to this appeal, we cite to the current version of the statute.

[23] The legislature amended this statute in 2023. LAWS OF 2023, ch. 470 § 3007. Because this amendment is not relevant to this appeal, we cite to the current version of the statute.

Accordingly, Houser's sufficiency of the evidence argument fails.

B. RELATED INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Houser also argues that defense counsel provided ineffective assistance by failing to require the State to directly elicit testimonial evidence from AH to support each count of first degree child molestation. Although his argument is vague, Houser appears to assert that defense counsel was required to ensure that the State presented direct testimonial evidence from AH at trial sufficient to establish each first degree child molestation charge.

But it is not defense counsel's responsibility to ensure that the State provides sufficient evidence of the charges—it is the State's burden. *State v. Restvedt*, 26 Wn. App. 2d 102, 127, 527 P.3d 171 (2023) ("The State bears the burden of proving every element of a crime beyond a reasonable doubt."). Because defense counsel was not responsible for ensuring that the State provided sufficient evidence, Houser cannot establish deficient performance on this ground, and this ineffective assistance of counsel claim fails.[24]

V. FALSE STATEMENTS IN DEFENSE COUNSEL'S DECLARATION

Houser next argues that the trial court suborned perjury when it failed to correct defense counsel's sworn statement in his July 22, 2022 declaration supporting Houser's request for a material witness warrant. Houser contends that the trial court suborned perjury by considering defense counsel's false statement that " '[t]he defense ha[d] endorsed Ms. Boyd and Mr. Cooley as witnesses based on the defense's witness list.' " PRP Opening Br. at 23 (quoting CP at 196). He

---

[24] To the extent Houser may also be arguing that defense counsel provided ineffective assistance by failing to challenge the sufficiency of the State's evidence, that argument would also fail because defense counsel moved to dismiss for insufficient evidence after the State presented its case in chief. It would also fail because, as discussed above, the evidence was sufficient.

also raises related ineffective assistance and prosecutorial misconduct claims. These arguments fail.

Houser is correct that defense counsel's declaration states that the defense had endorsed Boyd and Cooley in the defense witness list. But he fails to establish that this was a false statement because the defense's witness list and supplemental witness list expressly incorporated the State's witness list, which included Boyd and Cooley. Additionally, he fails to say how his counsel's incorporation of the State's witness list prejudiced him. Accordingly, Houser is not entitled to relief on this ground.

In related arguments, Houser also argues that defense counsel provided ineffective assistance of counsel when he committed perjury by stating that Boyd and Cooley were on the defense's witness list and that the State engaged in misconduct by failing to correct the perjured statement. As discussed above, Boyd and Cooley were on the defense's witness list. Accordingly, Houser also fails to establish ineffective assistance of counsel or prosecutorial misconduct on this ground.

## VI. REMOTE APPEARANCES

Houser next argues that the trial court violated his constitutional right to confront witnesses when it permitted Boyd and Cooley to appear remotely without first conducting a *Craig* hearing because there was no showing of necessity or reliability.[25] In related arguments, Houser also argues that defense counsel provided ineffective assistance of counsel by (1) agreeing to the remote

---

[25] In his reply, Houser also argues that the trial court should not have permitted the remote testimony without first determining that Boyd and Cooley were unavailable. We do not address this argument because it is raised for the first time in a reply brief. *Cowiche Canyon Conservancy*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

testimony and by not requesting a continuance to facilitate Boyd's and Cooley's in-person testimonies; and (2) failing "to attack the State's request that the defense counsel deal with the material witness warrant for the State's witnesses." PRP Opening Br. at 52. He also contends that the State engaged in prosecutorial misconduct by (1) failing to diligently pursue efforts to secure Boyd's and Cooley's in-person testimonies, (2) delaying disclosure of the fact Boyd and Cooley did not intend to appear at trial, and (3) relying on Houser to seek a material witness warrant. These arguments fail.

## A. LEGAL PRINCIPLES

The state and federal confrontation clauses guarantee the right of a defendant to confront witnesses against them. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. But, although preferable, the right to face-to-face confrontation is not absolute. *State v. Davis*, 141 Wn.2d 798, 846, 10 P.3d 977 (2000); *State v. Foster*, 135 Wn.2d 441, 473, 957 P.2d 712 (1998). "This preferred right of physical presence, or 'face-to-face' confrontation, may be dispensed with only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Foster*, 135 Wn.2d at 457 (quoting *Craig*, 497 U.S. at 850).

Defendants can, however, waive a fundamental constitutional right if they do so knowingly, voluntarily, and intelligently. The right to confront witnesses falls into the category of rights that trial counsel can waive as a matter of trial strategy without the defendant's personal expression of waiver. *State v. O'Cain*, 169 Wn. App. 228, 244-45, 279 P.3d 926 (2012) ("As with decisions implicating trial strategy, the decision to raise a confrontation clause objection is a determination that is reserved to the discretion of competent defense counsel."); *Wilson v. Gray*,

345 F.2d 282, 287-88 (9th Cir.1965) (holding that the right to confrontation was waived by trial counsel's stipulation to the matter being heard based on the transcript of the preliminary hearing); *see also State v. Thomas*, 128 Wn.2d 553, 559, 910 P.2d 475 (1996) (stating that the right to confrontation is similar to the right to testify, right not to testify, and right to self-representation in that it can be waived by counsel).

B. WAIVER

Here, in Houser's presence and without any objection on his part, defense counsel agreed that Boyd and Cooley could testify remotely by Zoom. The record shows that under the circumstances of the case at the time of trial, counsel's decision was deliberately made as a matter of trial tactics and strategy. Thus, Houser waived his right to face-to-face confrontation.[26]

C. RELATED INEFFECTIVE ASSISTANCE CLAIMS

Houser also argues that defense counsel's waiver and decision not to seek a continuance to secure in-person testimony amounted to ineffective assistance of counsel. For this ineffective assistance of counsel claim to have merit Houser must establish prejudice. This he fails to do.

Houser argues that the failure to have the witnesses physically present can increase the likelihood that the witness will lie, that Boyd and Cooley had already lied, and that the remote context prevented the jury from being able to observe the witnesses' demeanors and prevented

---

[26] In his supplemental PRP brief, Houser argues that we should not find waiver on this record because the trial court did not engage in a colloquy with Houser or defense counsel about the waiver before Cooley's testimony, there was no stipulation to the remote testimony, and the one short discussion that came after Cooley's testimony was not sufficient. But Houser does not cite to any authority establishing that a colloquy was required or that the waiver must be memorialized on the record before the remote testimony occurs, so we do not address these arguments further. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

defense counsel from adequately cross-examining at least one of the witnesses. But in this instance the witnesses appeared via Zoom, which allowed all parties to see each other, allowed the jury to observe the witnesses while they testified, and permitted Houser to cross-examine the witnesses. And the Zoom appearances did not prevent Houser from being able to effectively impeach the witnesses and extensively discuss nontestimonial aspects of their appearances such as Cooley's intensity and facial expressions in closing argument.

Houser does not present any evidence establishing that the remote appearance made it easier for the witnesses to lie,[27] prevented the jury from adequately observing the witnesses, or impeded defense counsel's cross-examination in any way. A mere assertion that face-to-face confrontation would have been more productive or that a witness is more likely to lie when not testifying in person is not sufficient. Accordingly, Houser does not establish prejudice and fails to demonstrate ineffective assistance of counsel on this ground.

Houser also suggests that defense counsel provided ineffective assistance by assisting the State in obtaining Boyd's and Cooley's testimonies because their testimony was clearly prejudicial and any benefit from their testimony that defense counsel hoped to gain from such testimony was clearly outweighed by its harm. We disagree.

Boyd's and Cooley's testimonies provided Houser with an opportunity to demonstrate that Boyd and Cooley may have influenced or coached AH because there was a conflict with Houser. *See* 13 VRP at 361; 17 VRP at 768. Although Houser asserts that the damage caused by Boyd's and Cooley's testimonies far outweighed any benefit Houser could have derived from that

---

[27] In fact, the testimony that initially raised questions about Boyd's and Cooley's veracity occurred during their *live* testimony at the child competency/child hearsay hearing. Arguably this suggests that to the extent Boyd and Cooley were lying, testifying in person was not a deterrent to lying.

testimony, this assertion is not sufficient to overcome the presumption that defense counsel's performance was reasonable because potential impeachment is a legitimate reason for seeking a witness' testimony. *Estes*, 188 Wn.2d at 458. Accordingly, defense counsel had legitimate reasons for seeking Boyd's and Cooley's testimonies and this ineffective assistance of counsel claim also fails.

## D. RELATED PROSECUTORIAL MISCONDUCT CLAIMS

Houser also contends that the State engaged in prosecutorial misconduct by failing to diligently pursue efforts to secure Boyd's and Cooley's in-person testimonies, by delaying disclosure of the fact Boyd and Cooley did not intend to appear at trial, and by relying on Houser to seek a material witness warrant. But, as discussed above, Houser does not establish prejudice in light of Boyd's and Cooley's remote testimonies, so these arguments fail.

## VII. TRIAL COURT'S FAILURE TO INVESTIGATE BOYD'S COMPETENCY

Houser next argues that the trial court erred when it failed to inquire into Boyd's competency after she disclosed that she had memory issues following a car accident. This argument fails.

On direct examination by the State, Boyd testified that she had memory issues that were caused when she hit her head in a car accident. She testified that she had difficulty remembering "time frames," "exact dates and when things were, events of things." 16 VRP at 560.

On cross-examination, Boyd again testified that she had been in a car accident that had affected her memory. When Houser asked her if she had "noticed a substantial decline in [her] memory," she responded, "Kind of." *Id.* at 567. She agreed that she was afraid that she could have suffered some brain damage, but she stated that she had not seen a doctor about this. Neither party

objected to Boyd testifying on the ground that she was not competent to testify due to her apparent head injury, and the trial court did not inquire into Boyd's competency.

Adult witnesses are presumed competent to testify. *State v. Johnston*, 143 Wn. App. 1, 13, 177 P.3d 1127 (2007). Witnesses are, however, not competent to testify if they are of "unsound mind" or appear to be incapable of receiving facts or relating them truthfully. RCW 5.60.020; CrR 6.12. Even if the trial court had been required to examine Boyd's competency, Houser does not establish prejudice on this record. Although Boyd's memory issues were certainly relevant to the credibility and weight of her testimony, it would not have shown that she displayed a total lack of comprehension or an inability to distinguish right from wrong. Therefore, this record would not have been sufficient to preclude her from testifying, and Houser cannot establish a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice. Accordingly, Houser fails to show that he is entitled to relief on this ground.

## VIII. ADDITIONAL HEARSAY DISCLOSURES

Houser also argues that the trial court erred in admitting evidence of some of AH's additional disclosures because they were untimely disclosed and not disclosed in the probable cause statement. He also raises a related prosecutorial misconduct claim. We either decline to reach these arguments or they fail.

### A. UNTIMELY DISCLOSURES

Houser argues that the trial court erred when it admitted evidence of AH's additional disclosures of alleged sexual misconduct that were disclosed just two weeks before the trial. The only additional disclosures he identifies are the statements regarding Houser's " 'yogurt,' " a statement that Houser " 'was sucking her,' " and a statement " 'that her dad made her taste white

stuff and he used a finger.' " PRP Opening Br. at 28 (citing 15 VRP at 519; 16 VRP at 561-62, 567-68).

On appeal, this court declined to address whether these disclosures were inadmissible due to lack of notice because Houser had not objected to Boyd's or Cooley's testimonies related to these statements. *Houser*, 30 Wn. App. 2d at 268. This court noted that Houser had not objected to "Cooley's testimony at trial that A.H. tasted Houser's 'yogurt' or to Boyd's testimony that 'her dad was sucking her.' " *Id.* (quoting 15 VRP at 515; 16 VRP at 561). Assuming that Houser's current argument is distinct from the notice argument he raised in his appeal, it suffers the same fate. Houser did not object to any of the testimony he now challenges. Accordingly, we decline to address this argument. RAP 2.5(a).

B. EVIDENCE NOT DISCLOSED IN PROBABLE CAUSE STATEMENT

Houser also argues that the trial court erred when it admitted this evidence because it disclosed alleged sexual conduct that was not described in the probable cause statement. Because Houser did not object on this ground in the trial court, we decline to address this issue. RAP 2.5(a).

C. RELATED INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Houser also argues that defense counsel provided ineffective assistance of counsel by failing to move to suppress these same statements and possibly additional testimony referring to Houser's "white stuff." PRP Opening Br. at 58 (citing 15 VRP at 518-19, 524-25; 16 VRP at 567). He contends that defense counsel should have objected to the admission of evidence about these late disclosures because they were "not relevant to the initial Probable Cause, the alleged criminal conduct that as charged in the Amended Information, and would have been other alleged uncharged criminal conduct." *Id.* He asserts that defense counsel failed to require the State to

demonstrate the circumstances of this other alleged criminal conduct to see if this was part of a different incident or part of the continuing course of conduct. And he also appears to assert that the failure to challenge the additional disclosures subjected him to additional charges that he did not have time to prepare to defend against. These arguments fail.

Although these additional disclosures were not in the probable cause statement, the probable cause statement is not intended to encompass all the evidence. *See* CrR 3.2.1(a); CrR 4.7(a)(1)[28] (State's discovery obligations must be met no later than the omnibus hearing). Thus, any objection based on relevancy would have been denied, and Houser cannot establish ineffective assistance on this ground.

Houser's assertion that these additional statements were evidence of other, uncharged crimes also fails to establish ineffective assistance of counsel. These additional statements were additional evidence of sexual contact during the relevant period of time and were relevant to the child molestation charges, they did not relate to any uncharged criminal conduct.

And Houser's claim that these additional statements subjected him to additional charges is not supported by the record. The amended charges were filed on June 10, 2022, well before the child competency hearing or the trial. The State did not amend the charges to include additional charges after this evidence was disclosed.

Accordingly, Houser does not show that he received ineffective assistance of counsel based on the admission of these additional statements.

---

[28] CrR 4.7 has been amended twice since the events in this case, effective October 1, 2024 and April 29, 2025. Since neither amendment affects our analysis, we cite the current version of the rule.

D. RELATED PROSECUTORIAL MISCONDUCT CLAIM

Houser further argues that the State engaged in prosecutorial misconduct by introducing additional evidence of sexual misconduct that was relevant only as evidence of uncharged criminal conduct only two weeks before the trial. He directs us to the same statements discussed above and further asserts that AH's statements also included an allegation that "she touches [Houser] in his private area."[29] PRP Opening Br. at 75 (citing 16 VRP at 561-62, 567-68).

As discussed above, these new statements were relevant to the charges and they did not relate to uncharged crimes. Furthermore, Houser did not object to this evidence as untimely, and he fails to show that any error could not have been obviated by a recess to permit Houser some additional time to prepare to address this new evidence. Accordingly, Houser does not establish prosecutorial misconduct on this ground.

IX. ADMISSION OF DNA AND SEMEN EVIDENCE

A. ADMISSION OF DNA AND SEMEN EVIDENCE

Houser argues that the trial court erred when it admitted the DNA evidence and the evidence of the semen stains. Houser contends that the admission of the DNA evidence and evidence of the semen stains was error because there were alternate explanations for the presence of the DNA evidence on AH's mattress cover and alternate explanations for why there were two semen stains on the mattress cover.[30]

---

[29] We note that we were unable to find this last reference in the record cited by Houser.

[30] Although Houser did not object on these grounds in the trial court, we briefly address them because this analysis is relevant to his related ineffective assistance of counsel claims.

But the existence of alternate explanations for DNA evidence and the evidence of semen on the mattress cover is irrelevant to whether that evidence was admissible. The other explanations for the presence of the semen stains and the DNA would go to the weight and persuasiveness of the DNA evidence, not to its admissibility.

Houser may also be arguing that the trial court should not have admitted the DNA or semen evidence because sexual motivation or sexual gratification was not an element of the crimes. But sexual contact is an element of first degree child molestation and sexual contact requires proof that the touching is done for the purpose of gratifying sexual desire. RCW 9A.44.010(13). Evidence of Houser's semen was relevant to the sexual contact element. In addition, the evidence of two semen stains was relevant to show that more than one sexual act had occurred and would have been admissible for that purpose. Accordingly, this argument fails.

B. RELATED INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Houser also argues that defense counsel provided ineffective assistance of counsel by failing to object to the DNA or semen evidence on grounds that (1) there were other explanations for the presence of the DNA and semen evidence, and (2) this evidence was evidence of a greater crime. But, as discussed above, the fact there were other potential explanations for the presence of the DNA and semen evidence is not relevant to the admissibility of the evidence, so any objection on this ground would not have been successful. And Houser was not charged with a greater crime and the DNA and semen evidence was relevant to the element of sexual contact, so any objection based on Houser's claim that this evidence was relevant to a greater crime would also have failed. Accordingly, these ineffective assistance of counsel claims fail.

X. DEFENSE MOTION TO DISMISS

Houser argues that the trial court erred when it failed to require the State to provide a more definite statement of the relevant time period or to elect which separate and distinct acts supported each count when considering Houser's motion to dismiss brought after the State rested its case in chief. But, although Houser noted that there was a "lack of specificity with regard to the multiple counts of child molestation," Houser's argument was that the State had failed to present sufficient evidence to support more than one count of first degree child molestation. 16 VRP at 644. He requested only the State to identify each count and the evidence upon which it was relying to prove each count in order to establish there was sufficient evidence to move forward on each count. Accordingly, this argument fails.

Houser also argues that defense counsel provided ineffective assistance of counsel because he failed to adequately research the case law relevant to the defense motion to dismiss. But Houser merely states the well-established standards for a sufficiency of the evidence argument. He does not identify what relevant case law defense counsel failed to discover or the nature of the arguments defense counsel failed to make when counsel brought the motion to dismiss. Accordingly, this argument fails.

XI. JURY ISSUES

Houser next argues that the trial court erred by designating Juror 11 as an alternate juror and permitting Juror 13, a juror who had revealed after opening arguments that they were familiar with Boyd, to serve as a deliberating juror in Juror 11's place. Houser's primary argument is that the trial court erred in permitting Juror 13 to remain on the jury after they disclosed an association

with Boyd. Houser asserts that this substitution denied him his right to a fair and impartial jury trial.

In a related argument, Houser also argues that defense counsel provided ineffective assistance by failing to object to the trial court's decision to designate Juror 11 as an alternate juror. These arguments fail.

A. ADDITIONAL FACTS

Juror 13 was originally seated on the jury as an alternate juror. At the close of Houser's opening statement, Juror 13 disclosed that they may have had some contact with Boyd as a teacher. It was established through questioning of Juror 13 that any contact with Boyd, if it occurred, happened a significant time before the events of this case, that Juror 13 did not recall *any* interactions with Boyd, and that Juror 13 had neither a favorable nor unfavorable opinion of Boyd. Juror 13 also confirmed that nothing about these possible prior interactions with Boyd would influence her decision in this case and that she could remain fair and impartial. The trial court allowed Juror 13 to remain without objection from either party.

Just before closing arguments, the trial court and the parties expressed concern about Juror 11's ability to participate in the deliberations and agreed that Juror 11 would serve as an alternate juror instead of Juror 13. The trial court began the conversation by pointing out that although Juror 11 had appeared to be attentive during the proceedings, the juror had continually had problems following or remembering simple directions or instructions, such as where and when to enter the courtroom and that the juror's notepad had to be turned down when they were absent from the jury box, despite being in the courtroom for a week and a half. The trial court then asked the parties if they had made any similar observations.

The State agreed that the trial court's characterization of the juror was correct. Defense counsel stated that they had not personally observed any of this, but they had seen one instance where the juror could have been sleeping because her eyes were closed. But defense counsel stated he was concerned about the juror's ability to follow the court's jury instructions if the juror still needed additional instructions about what door to use and that she needed to turn over her notes.

The trial court also asked for input from the judicial assistant. The judicial assistant stated that the juror had displayed confusion about where the bathrooms were located and how to exit the courtroom at the end of the day despite having previously been instructed on these matters. The judicial assistant also noted that the juror appeared to need help carrying her bag. The trial court acknowledged that the juror had some obvious physical difficulties, but it stated that that was not what was concerning the trial court.

After hearing from the parties and the judicial assistant, the trial court decided that if the parties agreed to waive any issue related to this juror on appeal, it would redesignate Juror 11 as an alternate and redesignate Juror 13 as a deliberating juror.

Defense counsel stated that given the juror's inability to remember what door to use, where the bathrooms were, and the requirement to turn over her notepad, he had concern about the juror's ability to follow directions and would not object to the juror's removal. Defense counsel also advised the trial court that he had spoken to Houser and that Houser had expressly "waive[d] any claim of error based on the reassigning of Juror No. 11 to the position of working as an alternate." 17 VRP at 742. The State did not object to redesignating Juror 11 as an alternate juror.

B. SEATING OF JUROR 13

As noted above, Houser's primary argument is that the trial court erred in permitting Juror 13 to remain on the jury after they disclosed an association with Boyd. This argument fails.

1. LEGAL PRINCIPLES

We review a trial court's decision about whether to excuse a juror for an abuse of discretion. *State v. Depaz*, 165 Wn.2d 842, 852, 204 P.3d 217 (2009). The trial court is best able to observe the juror's demeanor and, based on that observation, interpret and evaluate the juror's answers to determine the juror's impartiality. *State v. Davis*, 175 Wn.2d 287, 312, 290 P.3d 43 (2012)[, *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 25, 427 P.3d 621 (2018) (plurality opinion)]. A trial court abuses its discretion when its decision is based on untenable grounds or reasons. *Depaz*, 165 Wn.2d at 852.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a defendant the right to a criminal trial by an impartial jury. *State v. Yates*, 161 Wn.2d 714, 742, 168 P.3d 359 (2007)[, *abrogated on other grounds by Gregory*, 192 Wn.2d at 25]. A trial court is required to excuse from further jury service any juror who, in the opinion of the judge, has manifested unfitness by reason of bias or prejudice. RCW 2.36.110. "The question for the judge is whether the challenged juror can set aside preconceived ideas and try the case fairly and impartially." *Hough v. Stockbridge*, 152 Wn. App. 328, 341, 216 P.3d 1077 (2009).

*State v. Moen*, 4 Wn. App. 2d 589, 596, 422 P.3d 930 (2018).

2. DISCUSSION

Although Juror 13 did not disclose their past contact with Boyd until after the opening statements, they did so as soon as they recognized Boyd's name. And when the trial court examined Juror 13 about any potential bias, Juror 13 stated that the contact with Boyd was several years earlier, that they had little recollection of their interactions with Boyd, and that they did not know anything that would influence their evaluation of her testimony. Juror 13 also testified that they would be able to remain an impartial and objective assessor of the facts.

The trial court's examination of Juror 13 provides tenable grounds for the trial court's decision that Juror 13 could remain on the jury. Because the trial court did not abuse its discretion in permitting Juror 13 to remain on the jury, this argument fails.

Houser also argues that the inquiry was not sufficient because the court did not ask the State or defense counsel if they agreed to Juror 13 remaining on the jury panel. Although the trial court did not ask the parties if they agreed with its ruling regarding Juror 13, the parties had the opportunity to object and did not do so. And given Juror 13's responses to the trial court's questioning, it was unlikely that they would have objected if they had been invited to do so. Because Houser does not show that the parties would have objected, this argument fails.

C. RELATED INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Houser, preferring that Juror 11 had remained as a deliberating juror, argues that defense counsel provided ineffective assistance by failing to object to the trial court's decision to designate Juror 11 as an alternate juror and, instead, agreeing to waive any objection to Juror 13 becoming a deliberating juror. Houser contends that the trial court's observations that led to the decision to redesignate Juror 11 as an alternate juror could have been due to a disability that could have been accommodated and that defense counsel's failure to object prevented further investigation of this issue. He asserts that the trial court's decision "wasn't based on any specific observation other than what others had observed." PRP Opening Br. at 61.

What occurred in this case was unusual, because the proper remedy for a juror's actual inability to sit on a jury (irrespective of whether the juror has been designated as a deliberating juror or an alternate juror) is removal from the jury. The remedy is not relegation of the juror to

alternate juror status rather than deliberating juror status. An alternate juror must be ready and available at any moment to replace a juror who can no longer deliberate.

Despite the unusualness of what occurred, Houser does not establish any prejudice from the fact that Juror 11 did not sit as a deliberating juror because a defendant "has no right to be tried by a particular juror." *State v. Gentry*, 125 Wn.2d 570, 615, 888 P.2d 1105 (1995).

## XII. ADDITIONAL INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Houser also raises several additional ineffective assistance of counsel claims.

### A. FAILURE TO REQUEST A BILL OF PARTICULARS

Houser argues that defense counsel provided ineffective assistance because he failed to request a bill of particulars specifying the separate and distinct acts supporting each charge. Houser asserts that the State's allegations in the probable cause statement failed to specify whether the facts alleged were separate and distinct acts or a continuing course of conduct.

The purpose of a bill of particulars is to "amplify or clarify particular matters essential to the defense." *State v. Holt*, 104 Wn.2d 315, 321, 704 P.2d 1189 (1985). To obtain a bill of particulars, the defendant must show that " 'it is necessary that defendant have the particulars sought in order to prepare the defense and in order that prejudicial surprise will be avoided.' " *State v. Allen*, 116 Wn. App. 454, 460, 66 P.3d 653 (2003) (quoting 1 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 129, at 652-54 (3d ed. 1999)). But no bill of particulars is required if the particulars are already in the charging document or if the information called for has been provided by the government in some other satisfactory form. *Noltie*, 116 Wn.2d at 845.

In this case, the State's charges clearly alleged that it was bringing three separate and distinct first degree child molestation charges. The amended information, which states the

elements of the crimes and the shared charging period for all three offenses, may not have specified the factual basis for each charge, but the State also provided a probable cause statement and discovery to establish the factual basis for each charge. Even presuming that the probable cause statement was not specific about the factual basis for each charge, Houser does not assert that he could not have discerned the individual factual bases from the discovery. Nor does he explain what additional information available to the State could have provided to further define the individual charges.

Houser does not explain what additional information he could have obtained had defense counsel requested a bill of particulars and he does not establish that the failure to request the bill of particulars was prejudicial. Accordingly, this ineffective assistance of counsel claim fails.

B. FAILURE TO CALL GH AS A WITNESS

Houser argues that defense counsel provided ineffective assistance because he failed to call GH as a witness to testify about AH's alleged conduct.

There is nothing in the record establishing what GH would have testified to if he had been called as a witness. Nor does Houser include a declaration from GH or defense counsel that explains what testimony might have been available if GH had testified. Thus, it is mere conjecture that GH's testimony would have been helpful to Houser, and he cannot establish prejudice. Accordingly, this ineffective assistance of counsel claim fails.

C. FAILURE TO CONDUCT ADEQUATE CROSS-EXAMINATION

Houser argues that defense counsel provided ineffective assistance by failing to adequately cross-examine the State's witnesses to show how the conflicting testimony regarding AH's initial disclosure to Cooley occurred.

The record shows that the State and defense counsel elicited testimony from Cooley about inconsistent statements he had made regarding the circumstances of AH's initial disclosure to him. Houser does not explain how defense counsel could have more effectively cross-examined the witnesses about the inconsistencies in Cooley's statements and testimony. Accordingly, Houser does not establish ineffective assistance of counsel on this ground.

D. FAILURE TO OBJECT TO LIFESTYLE QUESTION

Houser argues that defense counsel provided ineffective assistance by failing to object when the State questioned him about his lifestyle, specifically his involvement in the "kink community," during his testimony. PRP Opening Br. at 59. This argument fails.

Houser mischaracterizes the record. The State did not question Houser about his lifestyle or his involvement in the "kink community." The State merely asked Houser if having sex with his girlfriend on his daughter's bed would be something he would remember. Houser then responded by volunteering the information that it might not be something he would recall because he had an "explorative sexual life" and was part of the "kink community." 16 VRP at 691. The State did not solicit this specific answer. And it would have been a reasonable tactical decision for the defense not to bring additional attention to this specific testimony by objecting.

Because the State did not specifically elicit Houser's response and Houser fails to demonstrate that not objecting to this testimony was not a reasonable tactical decision, this ineffective assistance of counsel claim fails.

E. FAILURE TO OBJECT TO STATE'S FAILURE TO SPECIFY SPECIFIC TIME PERIODS

Houser argues that defense counsel provided ineffective assistance by not objecting to the State's failure to specify the time period during which each alleged act of first degree child

molestation occurred. He contends that the State's failure to elect coupled with the lengthy time period alleged in the information, from AH's birth to the date she disclosed the abuse, interfered with his ability to present a defense.

Although the State did not specifically state when each of the alleged incidents of child molestation occurred, it did repeatedly limit the time period to when Houser was living in the garage, which began when AH was about four years old, until AH made her disclosures in February 2020. Houser does not argue that this more limited time period interfered with his ability to prepare his defense. Accordingly, this argument fails.

F. FAILURE TO OBJECT DURING STATE'S CLOSING ARGUMENT

Houser argues that defense counsel provided ineffective assistance by failing to object to a portion of the State's closing argument. He contends that the State's argument "invade[ed] the province of the jury and pressure[d] the jury panel members to render a guilty verdict." PRP Opening Br. at 66.

Houser asserts that defense counsel should have objected to the following portion of the State's rebuttal:

> The Defense started talking about it happened at night, right, and you can't just rely on it like it happened at night. I agree with that, okay? If all of the State has, and that's it, if all the State has is, "My dad touches m[e] where he's not supposed to. It's down here. It happens at night." do you know what? Go in there and mark not guilty, okay? If that's all we've got, fine. Throw this case away. That's not all we have.

17 VRP at 789-90.

At best, the State was arguing that (1) the jury should not find Houser guilty if, as Houser had asserted in his closing argument, the State had failed to prove its case, but (2) the State had presented more evidence than Houser had implied in his closing argument. This was an accurate

statement of the law and characterization of Houser's argument. It was not a statement designed to appeal to the passion or prejudice of the jury or to pressure the jury into rendering a guilty verdict. Because any objection to this argument on this ground would have been rejected, Houser does not establish that defense counsel's failure to object amounted to deficient performance. Accordingly, this ineffective assistance of counsel claim fails.

G. FAILURE TO REQUEST A LESSER-INCLUDED OFFENSE INSTRUCTION

Houser argues that defense counsel provided ineffective assistance by failing to request a lesser-included offense instruction for fourth degree assault or possibly attempted child molestation or incest. This argument fails.

When considering an ineffective assistance of counsel claim, we presume defense counsel's performance was reasonable. *Estes*, 188 Wn.2d at 458. Thus, the defendant bears the burden of rebutting that presumption by demonstrating that counsel had no legitimate or tactical reason for their conduct. *Vazquez*, 198 Wn.2d at 248. Whether to request a jury instruction on a lesser-included offense is a tactical decision. *State v. Grier*, 171 Wn.2d 17, 39, 246 P.3d 1260 (2011). "[A]ssuming that defense counsel has consulted with the client in pursuing an all or nothing approach, a court should not second-guess that course of action, even where, by the court's analysis, the level of risk is excessive and a more conservative approach would be more prudent." *Id.*

Because this is a PRP, it is Houser's burden to establish error. Nothing in the record demonstrates whether he requested or he and defense counsel discussed the possibility of a lesser-included offense instruction. Nor does Houser provide any declarations from himself or defense counsel establishing whether they discussed the possibility of a lesser-included instruction.

Because Houser does not show whether defense counsel consulted Houser before deciding not to request a lesser-included instruction, Houser cannot establish error. Accordingly, this ineffective assistance of counsel claim fails.

H. FAILURE TO CHALLENGE JURY INSTRUCTION 17

Houser argues that defense counsel provided ineffective assistance by failing to challenge "Jury Instruction 17." This argument fails.

Jury Instruction 17 provided:

> The State alleges that the defendant committed acts of incest in the second degree on multiple occasions. To convict the defendant of incest in the second degree, one particular act of incest in the second degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of incest in the second degree.

CP at 237.

"In Washington, a defendant may be convicted only when a unanimous jury concludes that the criminal act charged in the information has been committed." *State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984), *overruled in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988), *abrogated in part on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014). "When the evidence indicates that several distinct criminal acts have been committed, but [the] defendant is charged with only one count of criminal conduct, jury unanimity must be protected." *Id.* at 572. To protect jury unanimity, the State must either identify one specific act it intends to rely on as the crime charged, or the court must give the jury a *Petrich* instruction, "explaining that all '12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt.' " *State v. McNearney*, 193 Wn. App. 136, 140, 373 P.3d 265 (2016) (quoting *Petrich*, 101 Wn.2d at 572).

Second degree incest occurs when a person "engages in sexual contact with a person whom he or she knows to be related to him or her." RCW 9A.64.020(2)(a). The State alleged that Houser had had sexual contact with his daughter multiple times. Jury Instruction 17 was a *Petrich* instruction, and it was required to ensure jury unanimity. Thus, any objection to this instruction would not have been successful.

Because this instruction was required, defense counsel's failure to object does not amount to deficient performance. Accordingly, this ineffective assistance of counsel claim fails.

### XIII. ADDITIONAL PROSECUTORIAL MISCONDUCT CLAIMS

Houser also presents two additional prosecutorial misconduct claims.

### A. FAILURE TO ELECT

Houser argues that the State engaged in prosecutorial misconduct when it failed to elect which separate and distinct act was the basis for each charge in its opening statement or closing argument. But the failure to elect in an opening statement or closing argument when the jury is provided with a unanimity instruction is not misconduct. *State v. Coleman*, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007)

> (When the prosecution presents evidence of multiple acts of like misconduct, any one of which could form the basis of a count charged, *either* the State must elect which of such acts is relied upon for a conviction or the court must instruct the jury to agree on a specific criminal act.)

(Emphasis added.).

### B. IMPROPER CLOSING ARGUMENT

Houser argues that the State engaged in prosecutorial misconduct when it "interjected statements that invaded the province of the jury panel, invoked to the passions and prejudices of

the jury panel, and were only done to pressure the jury panel to render a guilty verdict," during closing argument. PRP Opening Br. at 80.

The only portion of the State's argument to which Houser refers is the following portion of the State's rebuttal argument, to which counsel did not object:

> The Defense started talking about it happened at night, right, and you can't just rely on like it happened at night. I agree with that, okay? If all of the State has, and that's it, if all the State has is, "My dad touches m[e] where he's not supposed to. It's down here. It happens at night." do you know what? Go in there and mark not guilty, okay? If that's all we've got, fine. Throw this case away. That's not all we have.

17 VRP at 789-90.

As previously discussed, at best the State was arguing that (1) the jury should not find Houser guilty if, as Houser had asserted in his closing argument, the State had failed to prove its case, but (2) the State had presented more evidence than Houser had implied in his closing argument. This was an accurate statement of the law and characterization of Houser's argument. It was not a statement designed to appeal to the passion or prejudice of the jury or to pressure the jury into rendering a guilty verdict. Accordingly, Houser does not establish prosecutorial misconduct on this ground.

## XIV. CUMULATIVE ERROR

Houser argues that cumulative error has deprived him of his right to a fair trial. The cumulative error doctrine provides that a defendant may be entitled to a new trial when cumulative errors result in a fundamentally unfair trial. *Emery*, 174 Wn.2d at 766. Under the cumulative error doctrine, the defendant must show that the combined effect of multiple errors requires a new trial. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). Having reviewed all of Houser's claims,

we hold that he has failed to establish that any error, or combination of presumed errors, denied him a fair trial. Accordingly, this argument fails.

CONCLUSION

This PRP is denied.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

MAXA, P.J.

LEE, J.